173 F.3d 454
 LNC INVESTMENTS, INC. and Charter National Life Insurance
Company, Plaintiffs-Appellants,
v.
FIRST FIDELITY BANK, N.A. NEW JERSEY, United Jersey Bank and
National Westminster Bank, Defendants-Appellees.
 No. 98-7617.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 11, 1999.
Decided March 26, 1999.
 
 Raymond Fitzgerald, Butler, Fitzgerald & Potter, New York, NY, for plaintiffs-appellants.
 Daniel A. Pollack, Pollack & Kaminsky, New York, NY (Martin I. Kaminsky and Edward T. McDermott, on the brief, and Elizabeth J. Gorman, LeBoeuf, Lamb, Green & MacRae, L.L.P., Newark, NJ, and Laurence Greenwald, Strook & Strook & Lavan, New York, NY, of counsel), for defendants-appellees United Jersey Bank and National Westminster Bank.
 Seth T. Taube, McCarter & English, Newark, NJ (Steven A. Beckelman and Joseph T. Boccasini, on the brief), for defendant-appellee First Fidelity Bank, N.A. New Jersey.
 Before: JACOBS and SOTOMAYOR, Circuit Judges, and SAND,* District Judge.
 SOTOMAYOR, Circuit Judge:
 
 
 1
 Plaintiffs-appellants LNC Investments, Inc. ("LNC") and Charter National Life Insurance Company ("Charter") (collectively, "Bondholders") appeal from a judgment of the United States District Court for the Southern District of New York (Mukasey, J.) dismissing their claims for breach of fiduciary duty, breach of contract and violation of § 315(c) of the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. § 77ooo (c) (1997), following a jury verdict in favor of defendants-appellees First Fidelity Bank, N.A. New Jersey ("First Fidelity"), United Jersey Bank and National Westminster Bank (collectively, "Trustees"). The Bondholders own bonds that were issued by a trust administered by the Trustees. The bonds were secured by aircraft that the trust purchased from Eastern Air Lines, Inc. ("Eastern") and then leased back to Eastern pursuant to a sale/leaseback transaction. In March 1989, Eastern filed for bankruptcy, while still in possession of the aircraft.
 
 
 2
 The Bondholders allege that as a result of the Trustees' conduct throughout Eastern's bankruptcy, they will not receive all of the principal and interest to which they are entitled under the bonds, and they seek to hold the Trustees responsible for any shortfall. Specifically, the Bondholders claim that the Trustees acted imprudently by, among other things, waiting too long to move the bankruptcy court to lift the automatic bankruptcy stay or, alternatively, to order whatever other measures were necessary, possibly including the provision of additional security, to ensure that the Bondholders' interest in the collateral aircraft was adequately protected during the bankruptcy proceeding. The Bondholders argue that if the Trustees had moved earlier to lift the stay or for adequate protection, the bankruptcy court would have either lifted the stay and released the collateral to the Trustees, in which case the Trustees could have sold the aircraft for more than the bonds' value, or denied the motion, in which case the Bondholders' claims against Eastern's estate would have received superpriority over the claims of Eastern's other creditors.
 
 
 3
 After a trial, the jury found that the Trustees breached the prudent person standard applicable under the contract, the TIA and the common law of fiduciary duty, but that their imprudence did not proximately cause injury to the Bondholders. On appeal, the Bondholders argue, among other things, that (1) the district court improperly instructed the jury that the Bondholders had to establish proximate cause, including a reliance component, to prevail on their claims; and (2) the district court should have instructed the jury that the Bondholders' claims would have received superpriority status if the Trustees had moved more quickly to lift the stay or for adequate protection and if their motion had been denied. We hold that the general proximate cause instruction given by the district court was appropriate, but that the Bondholders are nevertheless entitled to a new trial because the reliance portion of the instruction was erroneous, as was the district court's failure to give the Bondholders' requested instruction on the applicability of New York General Obligations Law § 13-107(1). We further hold that the district court's superpriority instruction was erroneous because it required the jury to decide the legal question whether the Bondholders' claims would have qualified for superpriority status if the Trustees' motion had been made earlier and been denied.
 
 BACKGROUND
 A. The Trust Indenture
 
 4
 On November 15, 1986, Eastern entered into a sale/leaseback transaction with a secured equipment trust ("Trust") created pursuant to an equipment indenture and lease agreement ("Trust Indenture" or "Indenture") between Eastern and defendant First Fidelity, the Indenture Trustee. The transaction called for Eastern to sell 110 used aircraft to the Trust, and for the Trust, in turn, to lease the same aircraft back to Eastern. The Trust issued three series of equipment trust certificates ("Bonds"), each in different initial principal amounts and with different interest rates and maturity dates, in order to raise the funds needed to purchase the aircraft. The three series of Bonds had a total principal value of $500,000,000. Under the Trust Indenture, Eastern promised to make lease payments to the Trust in amounts sufficient to pay the principal and the interest due on the Bonds as well as the expenses of the Trust. Title to the aircraft was to be held in trust as collateral for the Bonds. On February 13, 1987, in connection with the registration of the Bonds with the U.S. Securities and Exchange Commission, the Trust Indenture was amended to designate a separate Trustee for each series of Bonds[1] and to redesignate First Fidelity as the collateral Trustee, which held title to the aircraft.
 
 B. Eastern's Bankruptcy
 
 5
 On March 9, 1989, while still in possession of the collateral aircraft, Eastern filed a voluntary petition in the United States Bankruptcy Court for the Southern District of New York seeking protection under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101 et seq. Eastern's bankruptcy constituted an "Event of Default" under the Indenture. See Trust Indenture § 7.01(g)(i)(2). Upon an Event of Default, the Trustees were to "excercise [sic] such of the rights and powers vested in [them] by [the Trust Indenture], and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." Trust Indenture § 9.02; see also 15 U.S.C. § 77ooo (c) ("The indenture trustee shall exercise in case of default (as such term is defined in such indenture) such of the rights and powers vested in it by such indenture, and ... use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."). Eastern's bankruptcy petition therefore triggered the Trustees' obligations of prudence under the Trust Indenture and the TIA.
 
 
 6
 Eastern's bankruptcy petition also triggered the automatic stay of § 362(a) of the Bankruptcy Code, which prevented the Trustees from taking possession of the collateral aircraft. See 11 U.S.C. § 362(a) (1993) ("[A] petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of ... any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate...."). As of the date of Eastern's bankruptcy petition, there were 104 aircraft, with an appraised value of $681,800,000, remaining in the collateral pool, and the aggregate principal value of the outstanding Bonds was $453,765,000. The Trust was therefore oversecured by more than $228 million, or, in other words, it maintained an "equity cushion" in that amount. Over the course of the next twenty months, however, the market value of the aircraft decreased significantly as a result of various factors, including the Iraqi invasion of Kuwait in August 1990, which caused fuel prices to rise. As of November 9, 1990, the appraised value of the 67 aircraft remaining in the collateral pool, together with the funds set aside in a "cash collateral account" from the sales and leases of aircraft formerly in the collateral pool, totaled somewhere between $475,443,000 and $589,679,000.
 
 
 7
 On November 14, 1990, the Trustees filed a motion for adequate protection pursuant to § 363(e) of the Bankruptcy Code, which requires a bankruptcy court to prohibit or condition a bankrupt party's use, sale or lease of property serving as collateral if such action is "necessary to provide adequate protection" of the creditor's interest in the collateral. See 11 U.S.C. § 363(e) (1993). The Trustees' motion sought protection of their interest in the collateral aircraft "in light of the rapid and constant deterioration of any equity cushion in the [c]ollateral [a]ircraft." Alternatively, the Trustees moved pursuant to § 362(d) of the Bankruptcy Code, 11 U.S.C. § 362(d)(1) (1993), for relief from the automatic stay of § 362(a) (collectively, "Lift Stay/Adequate Protection Motion" or "Motion"). Before the bankruptcy court ruled on the Motion, however, Eastern announced that it would cease operations entirely. On the same day, January 18, 1991, the Trustees and Eastern's Chapter 11 trustee executed two stipulations providing for, among other things, Eastern's release to the Trustees of the remaining aircraft in the collateral pool and the majority of the funds set aside in the cash collateral account. On January 23 and 24, 1991, the bankruptcy court approved the stipulations releasing the collateral to the Trustees.
 
 C. The Bondholders' Claims
 
 8
 The Bondholders purchased second series and, in LNC's case, third series Bonds at various times between September 1989 and March 1994.[2] The Bondholders subsequently brought suit against the Trustees alleging that the Trustees' delay in making the Motion was imprudent and deprived them of a substantial portion of the principal and accrued interest that they were entitled to under the Bonds.[3] Had the Motion been made earlier, the Bondholders contend, one of two favorable outcomes would have resulted: (1) an order lifting the stay and permitting the Trustees to recover and sell the aircraft at a time when the aggregate commercially reasonable sale value of the aircraft was more than 150 percent of the principal amounts owed on the Bonds; or (2) an order denying the Motion on the ground that the Trust's interest in the aircraft was adequately protected, i.e., by the existing equity cushion, in which case the Bondholders would have at least been entitled to superpriority distributions from Eastern's estate under § 507(b) of the Bankruptcy Code, 11 U.S.C. § 507(b) (1993), in advance of Eastern's administrative creditors. Because the Motion was made too late, they argue, their claims did not receive superpriority status, and as a result, the Bondholders were left with only general unsecured claims, for which they will receive nothing from Eastern's estate. According to the Bondholders, a prompt motion to lift the stay or for adequate protection was "the only prudent course of action open to the Trustees upon the happening of an Event of Default," see Second Amended Complaint p 28, and the Trustees' failure to make the Motion earlier constituted a breach of their fiduciary and contractual duties under the Indenture and a violation of § 315(c) of the TIA.
 
 D. The Trial
 
 9
 In March 1998, after extensive motion practice,[4] the Bondholders' claims against the Trustees were tried in a two-week bifurcated jury trial. After closing arguments in the liability stage, the district court instructed the jury on the "prudent man" standard applicable under the Indenture, § 315 of the TIA and the common law of fiduciary duty. See Trust Indenture § 9.02; 15 U.S.C. § 77ooo (c); In re Clark's Will, 257 N.Y. 132, 136, 177 N.E. 397 (1931) ("[A] trustee is bound to employ such diligence and such prudence in the care and management [of the trust], as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs.") (citation and internal quotation marks omitted). The court further instructed that "[i]n order to succeed on their claims, plaintiffs must prove that the defendants' acts or omissions were not only imprudent, but were also a proximate cause of injury to them." Transcript dated March 20, 1998, at 1312. The proximate cause instruction also included a reliance component, which stated that "[i]f the plaintiffs did not rely on the defendants, then even if the defendants acted imprudently, plaintiffs have not suffered any injury as a result of the defendants' actions or inactions." Id. at 1313. Although the Bondholders did not object at trial to the general proximate cause instruction, they objected to the reliance portion of the charge.
 
 
 10
 The Bondholders also asked the district court to instruct the jury that their claims would have received superpriority status under § 507(b) of the Bankruptcy Code if the Trustees had promptly filed the Motion and the bankruptcy court had denied it. The district court refused to give this proposed charge, however, and instead instructed the jury that the question whether the court's denial of the Motion would have resulted in superpriority status "was not clearly resolved and ... was the subject of disagreement among perfectly competent and diligent bankruptcy attorneys." Transcript dated March 20, 1998, at 1311. The court further instructed that the jury was "entitled to take this uncertainty in the law into account when [it] decide[d] whether the defendant banks acted as prudent persons in this case." Id. at 1311-12.
 
 
 11
 The jury ultimately returned a verdict finding that the Trustees had breached their duty of prudence, but that this breach did not proximately cause injury to the Bondholders. Based on the jury's findings, the district court entered judgment dismissing the Bondholders' complaint. The district court subsequently denied the Bondholders' post-trial motion to set aside the verdict, for judgment or for a new trial, which, among other things, claimed error in the jury instructions relating to proximate cause. This appeal followed.
 
 DISCUSSION
 A. Standard of Review
 
 12
 The Bondholders' primary contentions on appeal concern the district court's instructions to the jury. "We review a district court's jury instruction de novo." United States v. Masotto, 73 F.3d 1233, 1238 (2d Cir.1996). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." Anderson v. Branen, 17 F.3d 552, 556 (2d Cir.1994). "An erroneous instruction requires a new trial unless the error is harmless." Masotto, 73 F.3d at 1238.
 
 B. Reliance Instruction
 
 13
 The district court's proximate cause instruction included the following reliance component:
 
 
 14
 In considering whether the plaintiffs have suffered any damages, you must determine whether the plaintiffs have proved by a preponderance of the evidence that they relied upon the defendants. If the plaintiffs did not rely on the defendants, then even if the defendants acted imprudently, plaintiffs have not suffered any injury as a result of the defendants' actions or inactions. Similarly, if plaintiffs knew that the defendants were taking certain actions, knew all the facts and risks associated with those actions, and had the ability to correct them but chose not to, then you may find that those actions of the defendants did not cause the plaintiffs to suffer injury.In this regard, the plaintiffs need not show that they specifically expected or anticipated that the defendants would take any particular course of action. Rather, the plaintiffs must prove that they relied on the defendants to act prudently in general under the circumstances.
 
 
 15
 Transcript dated March 20, 1998, at 1313-14. The Bondholders argue that this instruction was erroneous because it required a finding of reliance to establish causation. We agree. To whatever extent the Bondholders' knowledge of the Trustees' conduct is relevant to the Bondholders' claims, it is in relation to potential affirmative defenses and not as an element of causation, as to which the Bondholders have the burden of proof.
 
 1. Reliance as an Element of Causation
 
 16
 The Trustees have identified no controlling authority--and we have found none--to suggest that reliance is required to establish causation in a breach of fiduciary duty or a breach of contract case.[5] The Trustees attempt to defend the reliance charge based on Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 684 F.Supp. 27 (S.D.N.Y.1988), aff'd, 865 F.2d 492 (2d Cir.1989) (per curiam), but that case is inapposite. In Ryder, the plaintiff buyer (REDCO) in a commodity futures contract brought suit against the seller's futures commission merchant (Merrill) when the seller (TOI) failed to deliver the heating oil that was the subject of the contract. Id. at 28. REDCO alleged that Merrill failed to ask TOI whether it owned and possessed the oil necessary to cover the contract before certifying the transaction to the New York Mercantile Exchange. The district court granted summary judgment to Merrill, concluding that no reasonable jury could find a causal connection between Merrill's alleged breach of duty and REDCO's loss because, "at the time REDCO determined to enter into th[e] contract with TOI, REDCO had a degree of knowledge approaching certainty that TOI did not at the time of contracting have physical possession of the quantity of oil covered by the contract." Id. at 35. On appeal, we affirmed the judgment of the district court and specifically expressed "agreement with the [district] court's conclusion that REDCO's causation theory was implausible." 865 F.2d at 493.
 
 
 17
 The Trustees attempt to analogize the Bondholders' knowledge of the Trustees' delay in making the Motion to REDCO's knowledge that TOI neither owned nor possessed the oil to be supplied under the contract in Ryder. They contend that under Ryder, this knowledge warranted a finding that the Trustees' imprudence did not proximately cause injury to the Bondholders. Ryder, however, involved a different type of duty from the one owed by the Trustees in this case. In Ryder, Merrill's duty was to ask TOI about the oil and to report TOI's response to the Mercantile Exchange in the form of a certification. See Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 782 (2d.Cir. 1984). That duty flowed to REDCO, the buyer, because "[a]lthough the primary beneficiary of the certification duty may well [have been] the market, it [was] not unreasonable to assume that the buyer ... might rely on the seller's [merchant] performing its regulatory duties." Id. However, because REDCO already knew that TOI neither owned nor possessed the oil, and therefore could not have relied on Merrill's certification, Merrill's failure to inquire before certifying the transaction could not have caused REDCO any injury. See 684 F.Supp. at 35.
 
 
 18
 In this case, by contrast, the Trustees' duty to the Bondholders was not to certify information but to act prudently to safeguard the assets of the Trust. See Beck v. Manufacturers Hanover Trust Co., 218 A.D.2d 1, 632 N.Y.S.2d 520, 528 (1st Dep't 1995) ("The trustee ... must, as prudence dictates, exercise [his contractually conferred rights and powers] in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation."). This duty of prudence was not qualified, either in the Trust Indenture or in the common law, by the concept of reliance. If, for example, the Trustees had breached their duty by dissolving the Trust's security interest in the collateral aircraft, the Bondholders would have suffered injury (measured by the decreased value of their Bonds) regardless of whether they were aware of the Trustees' actions or relied on the Trustees to act prudently. The reliance instruction therefore is not supportable based on Ryder.
 
 
 19
 The transcript of the charging conference suggests that the district court may have considered a reliance charge appropriate based on evidence that the Bondholders knew about the Trustees' alleged breaches of duty when they purchased the Bonds. See Transcript dated March 19, 1998, at 1186 ("[Y]ou knew very well when you bought the bonds that no motion had been made, and you went ahead and bought them anyway."). The fact that the Bondholders purchased the Bonds knowing that the Trustees had not yet moved for adequate protection or to lift the stay, however, does not preclude a finding that they were injured by the Trustees' imprudence. The New York General Obligations Law expressly permits a bondholder to sue an indenture trustee for breaches of duty that occur prior to his purchase of the bond, regardless of the bondholder's knowledge of these breaches. See N.Y. Gen. Oblig. § 13-107(1) (McKinney 1989) ("Unless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist, ... for damages against the trustee or depositary under any indenture under which such bond was issued or outstanding....").
 
 
 20
 The Bondholders specifically requested a jury instruction on § 13-107(1) to counteract the reliance charge. See Transcript dated March 19, 1998, at 1186 ("We've got to keep in mind that the [G]eneral [O]bligations [L]aw 13[-]107 puts us in the shoes of all prior owners of the bonds, and I don't know how under those circumstances, then, we can be tagged with having to rely."). We conclude that the district court erred in rejecting this request, particularly because the court admitted evidence at trial of the Bondholders' "specific knowledge relating to the value of the collateral aircraft, or whether the referenced applications [for relief from the stay and/or adequate protection] had been made by the indenture trustees." See Order dated March 2, 1998. Without an instruction that the Bondholders acquired all claims of the prior holders irrespective of their knowledge of such claims, the reliance charge invited the jury to find no proximate causation simply on the basis of the Bondholders' pre-purchase knowledge of the Trustees' imprudence.
 
 
 21
 We conclude that the district court's reliance instruction improperly conditioned causation on a finding of reliance. The instruction further permitted the jury, in violation of General Obligations Law § 13-107(1), to find no proximate causation based on the Bondholders' knowledge at the time they purchased the Bonds. As such, the instruction "mis[led] the jury as to the correct legal standard" and did not "adequately inform the jury on the law." See Anderson, 17 F.3d at 556. Furthermore, we are far from certain that the erroneous instruction was harmless. "An error is deemed harmless if we are convinced that the error did not influence the jury's verdict." Masotto, 73 F.3d at 1239. The district court specifically instructed the jury that "[i]f the plaintiffs did not rely on the defendants, then even if the defendants acted imprudently, plaintiffs have not suffered any injury as a result of the defendants' actions or inactions." Transcript dated March 20, 1998, at 1313. The jury, in turn, specifically found that the Trustees' failure to act in accordance with the prudent person standard did not proximately cause injury to the Bondholders. Given the congruence between the language of the reliance instruction and the jury's verdict, it is certainly possible, if not likely, that the reliance charge played a role in the verdict. The erroneous reliance instruction was, moreover, integral to the standard of liability because it precluded a finding of causation. "[W]here jury instructions create an erroneous impression regarding the standard of liability, it is not harmless error because it goes directly to the plaintiff's claim, and a new trial is warranted." Hathaway v. Coughlin, 99 F.3d 550, 554-55 (2d Cir.1996) (citing Hendricks v. Coughlin, 942 F.2d 109, 113-14 (2d Cir.1991)).
 
 2. Affirmative Defenses
 
 22
 Although the Bondholders' knowledge or lack of reliance cannot defeat a finding of causation in this case, the Bondholders' knowledge of the Trustees' imprudence may be relevant to affirmative defenses such as waiver, estoppel or ratification. See, e.g., Mooney v. Madden, 193 A.D.2d 933, 597 N.Y.S.2d 775, 776 (3d Dep't 1993) (noting that if the beneficiaries of a trust ratified or consented to the trustee's conduct, "they are bound by it"). In fact, the district court denied the Trustees' request to charge the jury on ratification, acquiescence and estoppel, apparently on the ground that these defenses were subsumed within the reliance instruction. See Transcript dated March 19, 1998, at 1109 ("The [ratification, acquiescence and estoppel] defense[s][are] not in this case, and there is a reliance charge."). That ruling had the effect of misplacing the burden of proving these affirmative defenses. See, e.g., 57 N.Y. Jur.2d Estoppel, Ratification and Waiver § 72, at 103 (1986); id. § 88, at 125. The reliance charge did not allocate this burden to the Trustees, but instead required the Bondholders to "prove[ ] by a preponderance of the evidence that they relied upon the [Trustees]." Transcript dated March 20, 1998, at 1313. We therefore cannot treat the erroneous reliance charge as the functional equivalent of an instruction on affirmative defenses.
 
 
 23
 We note, moreover, that the criteria for application of affirmative defenses such as waiver and ratification are stringent. In order to establish that the Bondholders waived their objections to the Trustees' conduct, for example, the Trustees would have to demonstrate, among other things, that the Bondholders effected a "deliberate, informed abandonment of known rights." See 57 N.Y. Jur.2d Estoppel, Ratification and Waiver § 84, at 121. Similarly, to establish that the Bondholders ratified the Trustees' conduct, the Trustees would have to prove, among other things, that the Bondholders acted "with full knowledge of all material facts relating to the transaction." See id. § 76, at 108. The Trustees could not carry their burden of establishing these defenses simply by proving that the Bondholders should not have purchased the Bonds knowing that the Trustees had not yet moved to lift the stay or for adequate protection. Under § 13-107(1) of the General Obligations Law, the Bondholders' purchase of the Bonds vested in them all of the prior holders' claims or demands against the Trustees, "whether or not such claims or demands [we]re known to exist." N.Y. Gen. Oblig. § 13-107(1). The Bondholders were therefore statutorily entitled to purchase the Bonds fully aware of the Trustees' alleged breaches of duty.
 
 
 24
 Furthermore, as the district court noted, the Bondholders alleged a continuing breach of duty by the Trustees, i.e., that the Trustees should have moved throughout the bankruptcy to safeguard the value of the collateral. See LNC V, 1997 WL 528283, at * 29 ("[P]laintiffs allege a continuing breach--i.e., that the Trustees should have moved throughout the bankruptcy--and could have assumed, when they purchased their certificates, that a motion for adequate protection would shortly be filed.... [P]laintiffs here knew only that no motion had been filed, not that that failure would cause them injury or that it would continue after their purchase."). The Bondholders' purchase of the Bonds with knowledge of the Trustees' past breaches therefore cannot by itself demonstrate that the Bondholders knew the Trustees would continue to act imprudently.
 
 
 25
 Nevertheless, the Trustees may be able to establish waiver, estoppel, ratification or similar affirmative defenses based on evidence other than or in conjunction with the Bondholders' pre-purchase knowledge of the Trustees' failure to make the Motion.[6] We leave it to the district court on remand to determine whether the Trustees have proffered sufficient evidence to sustain the presentation of any affirmative defenses to the jury, with appropriate instructions regarding the elements of each defense, burden of proof, and General Obligations Law § 13-107(1).[7]
 
 
 26
 Having decided to vacate the district court's judgment and remand for a new trial, we need not reach the other issues raised on appeal. We will, however, consider those of the Bondholders' remaining arguments that were adequately presented on appeal because they are likely to arise again on remand. See United States v. Jean-Baptiste, 166 F.3d 102, 110 (2d Cir.1999) ("Although these issues are, for purposes of this appeal, mooted by our discussion above, we address them briefly in light of the likelihood that they would recur at a new trial.").
 
 C. General Proximate Cause Instruction
 
 27
 The Bondholders contend that the district court's general jury instruction on proximate cause--i.e., that the "plaintiffs must prove that the defendants' acts or omissions were not only imprudent, but were also a proximate cause of injury to them"--was erroneous because proximate cause is not an element of liability with respect to any of their claims for relief. The Bondholders argue that the issue of causation arises only in the context of the scope of damages recoverable for breach of fiduciary duty and breach of contract.[8] Because the trial was bifurcated and the liability issues tried first, the Bondholders argue, they should not have been required to demonstrate proximate cause. We disagree.
 
 
 28
 Ordinarily, causation is required to recover damages for breach of contract. See E. Allan Farnsworth, Contracts § 12.1, at 841 (2d ed.1990) ("There is, of course, a fundamental requirement, similar to that imposed in tort cases, that the breach of contract be the cause in fact of the loss, although the presence of other contributing causes may not preclude recovery."); cf. Bausch & Lomb, Inc. v. Bressler, 977 F.2d 720, 731 (2d Cir.1992) ("A plaintiff seeking damages for breach of contract ... must demonstrate that the damages were caused by and are directly traceable to the ... breach.") (citations and internal quotation marks omitted). Under New York law,[9] in fact, "[t]he failure to prove damages is ... fatal to [a] plaintiff's breach of contract cause of action." Cramer v. Spada, 203 A.D.2d 739, 610 N.Y.S.2d 662, 664 (3d Dep't 1994) (affirming dismissal of complaint).
 
 
 29
 Causation is similarly an integral element of most tort causes of action. See W. Page Keeton et al., Prosser and Keeton on Torts § 41, at 263 (5th ed.1984) ("An essential element of the plaintiff's cause of action for negligence, or for that matter for any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered."). We have stated, however, that breach of fiduciary duty cases "comprise a special breed of cases that often loosen normally stringent requirements of causation and damages." Milbank, Tweed, Hadley & McCloy v. Boon, 13 F.3d 537, 543 (2d Cir.1994). This is because "[a]n action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach--not simply to compensate for damages in the event of a breach." ABKCO Music, Inc. v. Harrisongs Music, Ltd., 722 F.2d 988, 995-96 (2d Cir.1983). In a case alleging breach of fiduciary duty by a law firm, we have thus held that the client bringing the cause of action did not have to show either "but for" or proximate causation, but only that the law firm's breach was a "substantial factor" contributing to her injury. See Milbank, 13 F.3d at 543; see also ABKCO Music, 722 F.2d at 996 (holding that once district court found that plaintiff's conduct constituted breach of fiduciary duty, court was not required to find "but for" relationship between plaintiff's conduct and defendant's injury).
 
 
 30
 More recently, however, we have observed that under New York law, the level of causation required in breach of fiduciary duty and breach of contract cases depends on the type of remedy sought. See American Fed. Group, Ltd. v. Rothenberg, 136 F.3d 897, 907 n. 7 (2d Cir.1998). "Where ... the remedy sought is damages to compensate for a claimant's loss, the usual damages-causation rule for tort and contract breach cases is appropriate," but "where ... the remedy being sought is a restitutionary one to prevent the fiduciary's unjust enrichment as measured by his ill-gotten gain, the less stringent 'substantial factor' standard may be more appropriate." Id. at 908 n. 7. Thus, where damages are sought for breach of fiduciary duty under New York law, the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability. See R.M. Newell Co. v. Rice, 236 A.D.2d 843, 653 N.Y.S.2d 1004, 1005 (4th Dep't 1997) (affirming grant of summary judgment dismissing plaintiff's breach of fiduciary duty and inducement of breach of fiduciary duty claims because, "as a matter of law, any damages sustained by plaintiff were not proximately caused by wrongful conduct on the part of defendants, an essential element of plaintiff's causes of action against defendants"). "In the absence of a causal link between [the defendant's] alleged wrongful conduct and [the] plaintiff's alleged damages, the complaint must be dismissed." Id. (citing Stoeckel v. Block, 170 A.D.2d 417, 566 N.Y.S.2d 625, 626 (1st Dep't 1991) (declining to set aside jury verdict, which found that plaintiffs had breached their fiduciary duty to defendant but awarded no damages on defendant's counterclaim, because "it was not demonstrated that [defendant's loss] was attributable to plaintiffs' alleged wrongful conduct")).
 
 
 31
 In this lawsuit, the Bondholders seek only damages to compensate them for injuries allegedly sustained as a result of the Trustees' imprudence. See Second Amended Complaint pp 39, 43, 47, A-F. The district court's proximate cause charge was therefore appropriate. See American Fed. Group, 136 F.3d at 907 n. 7 ("In this case, the remedy being sought is compensatory damages measured by the claimant's loss, so that the appropriate injury causation standard, whether the remedy is sought for violation of fiduciary duty or breach of covenant, is the more stringent one.").[10]
 
 D. Superpriority Instruction
 
 32
 The Bondholders asked the district court to instruct the jury that if the Trustees had made the Lift Stay/Adequate Protection Motion sooner and the Motion had been denied, the Bondholders' claims would have received superpriority status under § 507(b) of the Bankruptcy Code.[11] The district court denied this request and instead instructed the jury that "at the time of the events giving rise to this lawsuit, that question of law was not clearly resolved and ... was the subject of disagreement among perfectly competent and diligent bankruptcy attorneys." Transcript dated March 20, 1998, at 1311. The court also told the jury that it was "entitled to take this uncertainty in the law into account when [it] decide[d] whether the defendant banks acted as prudent persons in this case." Id. at 1311-12.
 
 
 33
 On appeal, the Bondholders argue that this instruction was erroneous because it required the jury to decide the legal question whether the Motion, if promptly filed and denied, would have resulted in superpriority status for the Bondholders' claims. They contend, moreover, that this error was not harmless because the outcome of the Motion was critical to the jury's determination of whether the Trustees' delay in filing caused injury to the Bondholders. Had the jury been properly instructed on the law of superpriority status, the Bondholders argue, the jury would have found that the Trustees' delay was not only imprudent but also the proximate cause of injury to the Bondholders.[12]
 
 
 34
 As an initial matter, we note that the Bondholders' superpriority argument only has force if the Trustees' delay in making the Motion was the breach of duty found by the jury. This is not clear from the verdict form, which did not ask the jury to specify the factual basis for any finding of imprudence.[13] Although the Bondholders argue that any other breaches of duty by the Trustees were only relevant to the extent they impacted the Trustees' ability to make the Motion, the complaint alleges numerous other breaches of duty by the Trustees, many of which were argued at trial. See Second Amended Complaint p 37 (alleging that the Trustees "negligently failed to use the same degree of care and skill as a prudent man, in that, among other things, ... the Trustees negligently failed to heed the caveats in the March 1989 Avmark appraisal, warning of a dramatic decline in the value of the Trust aircraft in the near future; ... retain an aircraft marketing expert; ... investigate and monitor the physical condition of the Trust aircraft; ... investigate and monitor the market for aircraft of the type owned by the Trust; and ... investigate the remedies available to the Trust under the Bankruptcy Code"); id. pp 36, 42, 46 (alleging that the Trustees breached the prudent person standard "by, among other things, failing to make a prompt motion") (emphasis added). At the charging conference, in fact, the Bondholders objected to the Trustees' proposal to limit the prudent person question on the verdict form to the Trustees' failure to make the Motion prior to November 1990. Thus, we cannot be certain on this record that the Trustees' delay in making the Motion was the breach of duty found by the jury. Solely for purposes of addressing the Bondholders' superpriority argument, however, we will assume that the jury's verdict was predicated on the untimeliness of the Trustees' filing.
 
 
 35
 We agree with the Bondholders that the district court's superpriority instruction was erroneous because it invited the jury to decide a legal issue. The instruction stated:
 
 
 36
 You've heard conflicting testimony in this case about what happens if a creditor brings a lift-stay and/or adequate protection motion and the bankruptcy court decides not to lift the stay or to order additional protection because the court finds that the creditor has an equity cushion that is already sufficient to protect him. If the court's decision not to grant adequate protection turns out to be wrong, that is, if the equity cushion declines to the point that it is not in fact sufficient to cover the creditor's claims, is the creditor entitled to superpriority status on the portion of his claims that are not covered?
 
 
 37
 I instruct you that, at the time of the events giving rise to this lawsuit, that question of law was not clearly resolved and, as you have heard, was the subject of disagreement among perfectly competent and diligent bankruptcy attorneys. You are entitled to take this uncertainty in the law into account when you decide whether the defendant banks acted as prudent persons in this case.
 
 
 38
 Transcript dated March 20, 1998, at 1311-12 (emphasis added).
 
 
 39
 Insofar as the jury's consideration of the unsettled state of the law was limited to the question whether the Trustees' delay in making the Motion was prudent, the charge was undoubtedly correct. However, because the instruction did not give the jury any guidance on the law of superpriority status, it left the jury without a legal context in which to decide whether the Trustees' delay, if imprudent, caused injury to the Bondholders. By posing the superpriority issue as a question to the jury, the court improperly invited the jury to decide itself an issue of law that turns on the proper construction of § 507(b). See United States v. Nolan, 136 F.3d 265, 271 (2d Cir.) ("[M]atter[s] of statutory interpretation and legal definition [are] properly decided by the court, which is the 'final author[ity] on issues of statutory construction.' ") (quoting Federal Election Com'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 32, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981)) (last alteration in original), cert. denied, --- U.S. ----, 118 S.Ct. 2307, 141 L.Ed.2d 165 (1998).[14] Because the superpriority instruction required the jury to decide this legal question in order to resolve the causation issue, it failed "adequately [to] inform the jury on the law." Anderson, 17 F.3d at 556. On remand, the district court should therefore decide the issue and determine what type of charge on superpriority and causation is appropriate in light of any factual disputes remaining in the new trial.[15]
 
 
 40
 Because the case is being remanded for retrial, we need not and do not decide on the merits whether the requirements of § 507(b) are satisfied when a bankruptcy court denies a lift stay/adequate protection motion on the basis of adequate protection and that protection later proves inadequate. Our decision not to reach this issue on the merits is reinforced by the fact that it has not been adequately briefed and argued before this Court. As we have noted, however, while it will be entirely correct for the district court, on remand, to have a jury, appropriately instructed as to the law on superpriority status, consider whether the Trustees' delay in making the Lift Stay/Adequate Protection Motion was prudent, the jury should not be permitted to decide itself the legal question whether the bankruptcy court's denial of the Motion would have resulted in superpriority status by operation of § 507(b). Accordingly, if the district court decides that as a legal matter the denial of the Motion would have resulted in superpriority status for the Bondholders' claims, it should so instruct the jury and should determine by use of jury interrogatories, see Fed.R.Civ.P. 49(b), whether the Trustees breached their duty of prudence by failing to make the Motion earlier and, if so, what damages are specifically attributable to that failure. The jury's interrogatory answers will indicate whether the district court's charge on the legal result of the Motion had any effect on the jury's verdict. If not, the underlying legal question is mooted. Otherwise, the parties can address the merits of the district court's legal ruling in post-verdict motions to the district court and in a second appeal to this Court, if one is filed.
 
 CONCLUSION
 
 41
 For the reasons stated in this opinion, the judgment of the district court is vacated and the case remanded for a new trial.
 
 
 
 *
 The Honorable Leonard B. Sand, District Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Midlantic National Bank was designated as the first series Trustee, defendant United Jersey Bank was designated as the second series Trustee, and defendant National Westminster Bank was designated as the third series Trustee. Midlantic National Bank is not a defendant in this case
 
 
 [2]
 LNC purchased second series Bonds in July and September 1990, and third series Bonds from July through September 1990 and from July 1992 through March 1994. As of December 1996, after reselling certain second series Bonds, LNC owned $1,000,000 in principal amount of second series Bonds and $25,082,000 in principal amount of third series Bonds. Charter purchased second series Bonds in September 1989 and September 1990. As of December 1996, Charter owned $1,000,000 in principal amount of second series Bonds
 
 
 [3]
 The Bondholders also alleged malpractice by two law firms retained by certain of the Trustees in connection with Eastern's bankruptcy proceeding. The district court granted summary judgment to the defendant law firms in August 1997. See LNC Investments, Inc. v. First Fidelity Bank, No. 92 Civ. 7584, 1997 WL 528283, at * 39-46 (S.D.N.Y. Aug.27, 1997) ("LNC V "). The Bondholders have not challenged the dismissal of these defendants on appeal
 
 
 [4]
 This case generated five written opinions in the district court. See LNC Investments, Inc. v. First Fidelity Bank, No. 92 Civ. 7584, 1997 WL 528283 (S.D.N.Y. Aug.27, 1997) ("LNC V "); LNC Investments, Inc. v. First Fidelity Bank, 935 F.Supp. 1333 (S.D.N.Y.1996) ("LNC IV "); LNC Investments, Inc. v. First Fidelity Bank, No. 92 Civ. 7584, 1995 WL 231322 (S.D.N.Y. Apr.19, 1995) ("LNC III "); LNC Investments, Inc. v. First Fidelity Bank, No. 92 Civ. 7584, 1994 WL 225408 (S.D.N.Y. May 26, 1994) ("LNC II "); LNC Investments, Inc. v. First Fidelity Bank, No. 92 Civ. 7584, 1994 WL 73648 (S.D.N.Y. Mar.3, 1994) ("LNC I ")
 
 
 [5]
 The Bondholders argued before the district court that "the reliance issue is something that exists for the TIA claim, but shouldn't exist for the breach of contract or the breach of fiduciary duty [claims]." Transcript dated March 19, 1998, at 1186. On appeal, the Bondholders contend that reliance is not an element of their claim under § 315(c) of the TIA. This argument was not preserved, and we do not consider it on appeal
 
 
 [6]
 To the extent, if any, the Bondholders had the legal ability to direct the trustees to act, but see LNC V, 1997 WL 528283, at * 15 (noting on summary judgment that the Bondholders alone were never able to issue a binding instruction to the Trustees to file the Motion because they never owned a majority of the Bonds in any series), this fact may be relevant to potential affirmative defenses
 
 
 [7]
 In holding that the Bondholders' knowledge of the Trustees' conduct is relevant, if at all, to potential affirmative defenses, as to which the Trustees have the burden of proof, and not to causation, we express no view on the district court's summary judgment ruling that the Bondholders' damages recoverable under the TIA were limited to out-of-pocket losses attributable directly to the Trustees' breach of the prudent person standard. See LNC V, 1997 WL 528283, at * 35, * 38 (holding that the Bondholders were not entitled to recover the full face value of their Bonds because the market price at the time of their purchases reflected the risk that the Bonds would not be fully redeemed, and the Bondholders could not argue that they expected full redemption). Although this ruling presumably had no impact on the trial because the liability issues were tried first, it may or may not be a factor in the new trial
 
 
 [8]
 The Bondholders assert that their TIA claim is governed by contract principles. For purposes of this appeal, we assume, without deciding, that the Bondholders are correct on this issue
 
 
 [9]
 The Bondholders' breach of fiduciary duty and breach of contract claims are governed by New York law. See Trust Indenture § 13.13 ("This Agreement and the [Bonds] ... shall be governed by and construed in accordance with the laws of the State of New York...."); Second Amended Complaint p 45 (alleging that upon an Event of Default, and at all times thereafter, a fiduciary relationship existed between the Trustees and the Bondholders "pursuant to the terms of the Indenture and pursuant to New York common law")
 
 
 [10]
 The Bondholders contend that even if the proximate cause instruction was appropriate, the district court should have instructed the jury not to consider the Iraqi invasion of Kuwait, which took place in August 1990 and undisputedly caused fuel prices to rise, on the issue of proximate cause. Although the district court addressed this issue on summary judgment, see LNC V, 1997 WL 528283, at * 31, it is not clear that the court decided the issue as a matter of law. The court may have ruled more narrowly that the Bondholders raised a genuine issue of material fact as to causation and that summary judgment to the Trustees was thus inappropriate. In any event, we believe the district court properly left this issue to the jury with instructions on the law of foreseeability. See Transcript dated March 20, 1998, at 1312-13 ("[I]n order to find that the defendants' actions or inactions were the proximate cause of harm to the plaintiffs, you must find that the risk reasonably could have been foreseen by the defendants. In this respect, it is not necessary to find that the precise event that caused the plaintiffs' injury was foreseeable, but it is necessary to find that the event was one of a class of risks that was foreseeable.")
 
 
 [11]
 Section 507(b) provides:
 If the trustee [or the debtor-in-possession] ... provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim ... arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.
 11 U.S.C. § 507(b) (1993); see also 11 U.S.C. § 1107(a) (1993) ("[A] debtor-in-possession shall have all the rights ... and shall perform all the functions and duties ... of a trustee serving in a case under this subchapter.").
 
 
 [12]
 The Bondholders also argue that under the doctrine of law of the case, they were entitled to an instruction on the law of superpriority status consistent with the district court's ruling on that issue in the Bondholders' favor one week prior to trial. See Order dated March 2, 1998 (noting that § 507(b) "permit[s] superpriority status when the Trustee 'provides' adequate protection that later proves insufficient," and concluding that "the sensible way to read the statute is that if a court finds adequate protection to exist, whether as the result of a pre-existing equity cushion or otherwise, and denies a lift stay motion on that basis, if the protection later proves inadequate, the resulting claim may be awarded superpriority status."). However, the law of the case doctrine "is, at best, a discretionary doctrine, which does not constitute a limitation on the court's power but merely expresses a general reluctance, absent good cause, to reopen rulings that the parties have relied upon." Tischmann v. ITT/Sheraton Corp., 145 F.3d 561, 564 (2d Cir.1998) (citations and internal quotation marks omitted). Moreover, even if under the law of the case doctrine and the circumstances of this case, the district court was required to give an instruction that conformed to its prior ruling, on appeal, we would still need to review the superpriority instruction de novo. See id. at 564-65 ("[I]t makes no difference on this appeal whether the magistrate judge acted in accord with the principle of law of the case. The issue on appeal is whether the [defendant's severance pay plan] is an ERISA plan. We would need to pass on that question de novo [in any event].")
 
 
 [13]
 The Verdict Form asked simply: "With respect to each of the defendants[,] ... do you find that the defendant failed to act in accordance with the prudent man standard?"
 
 
 [14]
 It is not apparent from the record before us whether the Trustees took the position that some factor other than statutory construction would have intervened to preclude a grant of superpriority status even if the Motion had been denied. We assume in light of the parties' arguments and solely for purposes of this appeal that the issue is purely legal
 
 
 [15]
 The Bondholders argue that the district court erroneously excluded certain evidence regarding the amount of funds Eastern had available to pay creditors holding superpriority claims. Whether funds existed to pay the Bondholders' superpriority claims is relevant to the question whether the Trustees' failure to make the Motion caused injury to the Bondholders. We need not reach this issue, however, because if the district court determines on remand that the Bondholders' claims would have been entitled to superpriority status had the Motion been filed earlier and been denied, it can then reconsider this evidentiary ruling, assuming the availability of funds is a disputed issue of fact. We note that even if this issue is not disputed, proximate causation would still be required with respect to the other breaches of duty alleged by the Bondholders, assuming the Bondholders continue to pursue those other breaches as part of their claims