**LNC INVESTMENTS, INC. and Charter National Life Insurance Co., Plaintiffs,**

v.

**FIRST FIDELITY BANK, National Association, New Jersey, United Jersey Bank, and National Westminster Bank, N.J., Defendants.**

**No. 92 CIV. 7584(CSH).**

United States District Court, S.D. New York.

March 31, 2000.

As Amended April 11, 2000.

---

Butler, Fitzgerald & Potter, New York (Raymond Fitzgerald, of Counsel), for Plaintiffs LNC Investments, Inc. and Charter National Life Insurance Co.

McCarter & English, LLP, Newark, NJ (Seth T. Taube, Pollack & Kaminsky, Daniel A. Pollack, Martin I. Kaminsky, Edward T. McDermott, Gibson, Dunn & Crutcher, LLP, New York, of Counsel), James P. Ricciardi, for Defendants United Jersey Bank and National Westminster Bank, N.J.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

This case, in which plaintiffs, holders of bonds issued by a trust administered by defendants, allege claims under the Trust Indenture Act ("TIA"), 15 U.S.C. § 77aaa *et seq.*, and state law, is now before this Court on remand for a new trial following

the Court of Appeals' reversal[1] of a judgment dismissing the complaint following a jury verdict in defendants' favor on the issue of liability in a bifurcated trial.[2] The Court of Appeals held that this Court's charge erroneously required the jury to decide a question of law arising out of the United States Bankruptcy Code ("the Code"), specifically, whether on a proper construction of the Code a secured creditor's claim is entitled to "superpriority" status if the creditor files a motion with the bankruptcy court for an order lifting the stay of proceedings against the debtor or, in the alternative, for an order of adequate protection, the bankruptcy court denies any relief, and the creditor's collateral subsequently proves inadequate to cover its claim.

This opinion answers that question.

## I.

Familiarity with the Court of Appeals' opinion and the prior opinions of this Court cited at 173 F.3d at 459 n. 4 is assumed. It is sufficient for present purposes to say that plaintiffs owned bonds that were issued by an equipment trust ("the Trust") created as part of a secured financing for Eastern Airlines ("Eastern"). The defendants were the indenture trustees. Following the trail blazed by the earlier opinions, I will refer to plaintiffs as "the Bondholders" and defendants as "the Trustees."

On November 15, 1986, Eastern entered into a sale/leaseback transaction covering 110 of its used aircraft. That transaction created the Trust. Eastern sold the aircraft to the Trust, which leased them back to Eastern. To raise the funds to purchase the aircraft, the Trust issued three series of equipment trust certificates ("Bonds"). These are the Bonds that the Bondholders bought. The three series of Bonds, whose interest rates and maturity dates differed, had a total principal value of $500,000,000. The Trust indenture obligated Eastern to make lease payments to the Trust in amounts sufficient to pay the principal and the interest due on the Bonds. Title to the aircraft was held in trust as collateral for the Bonds.

On March 9, 1989, while still possessing and making use of the collateral aircraft to conduct its business, Eastern filed a voluntary petition in the Bankruptcy Court for this District seeking protection under Chapter 11 of the Code, 11 U.S.C. § 1101 et seq. As of the date of the petition, there were 104 aircraft in the "collateral pool," with an appraised principal value of $681,-800,000. The aggregate value of the outstanding Bonds was $453,765,000. Accordingly the Bondholders were at that time oversecured to the extent of the difference between those amounts, namely, $228,035,-000, an amount referred to in bankruptcy parlance as an "equity cushion."

Over the course of the ensuing months, as the result of factors I need not describe, the market value of the aircraft decreased significantly. "As of November 9, 1990," the Court of Appeals observed, "the appraised value of the 67 aircraft remaining in the collateral pool, together with the funds set aside in a 'cash collateral account' from the sales and leases of aircraft formerly in the collateral pool, totaled somewhere between $475,443,000 and $589,679,000." 173 F.3d at 458.

The aggregate value of the outstanding Bonds at that time is not stated in the prior opinions, but the Trustees were sufficiently alarmed by the eroding collateral to file a motion in the Bankruptcy Court (Lifland, J.) on November 14, 1990, for adequate protection under § 363(e) of the Code, 11 U.S.C. § 363(e). That section requires a bankruptcy court to prohibit or condition a bankrupt party's use, sale or lease of property serving as collateral if such action is "necessary to provide adequate protection" of the secured creditor's

---

1. *LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey,* 173 F.3d 454 (2d Cir.1999).

2. The trial took place before Judge Mukasey. Subsequently the case was reassigned to me.

interest in the collateral. Alternatively, the Trustees moved pursuant to § 362(d) of the Code, 11 U.S.C. § 362(d)(1), for an order lifting the automatic stay of proceedings against Eastern imposed by § 362(a), which had been in effect since filing of the Chapter 11 petition and prevented the Trustees' foreclosing on the collateral. That application for relief, which together with the Court of Appeals I will occasionally refer to as "the Lift Stay/Adequate Protection Motion" or "the Motion," was pending undetermined before Bankruptcy Judge Lifland when, on January 18, 1991, Eastern ceased all operations and stipulated to the return of the remaining collateral (aircraft and cash) to the Trustee.

The Bondholders claim that these unhappy events left them in the unenviable position of general unsecured claimants against Eastern for unpaid principal amounts, and, because the value of the assets in the Eastern estate was not enough to pay even all the administrative claims, the second and third Bondholders will receive nothing. Confronted with that substantial economic loss, the Bondholders brought this action against the Trustees for breach of their duty to discharge their fiduciary responsibilities in a prudent manner. The Bondholders' principal criticism of the Trustees is that they waited too long before making a Lift Stay/Adequate Protection Motion.

Even if one assumes an imprudent delay by the Trustees in making the Motion (which for all practical purposes might not have been made at all), the Trustees are not liable to the Bondholders unless the Bondholders can show that failure to make the Motion caused them damage. The Bondholders undertake to make that showing by contending that if the Trustees had made the Motion and the bankruptcy court denied it, the Bondholders' claims would have qualified for "superpriority" status under § 507(b) of the Code.[3] Whether the Bondholders are right (the Trustees say they are not) is central to the Bondholders' effort to demonstrate that they were damaged by the Trustees' inaction. It is also the question of law identified by the Court of Appeals to be decided by this Court on remand and in advance of the second trial.

"Superpriority" is not a word that appears in the Code. It has been fashioned by courts and commentators to describe the enhanced status conferred upon a secured claim in the distribution of a bankrupt estate if the claim qualifies for § 507(b) treatment. A secured claim meeting § 507(b)'s prerequisites takes on the enviable nature of an administrative claim under § 507(a)(1), the highest priority the Code recognizes; moreover, § 507(b) provides that a qualifying secured claim "shall have priority over every other claim" allowable under § 507(a)(1). Hence the entirely appropriate adjective "*super priority*": in the privileged world of administrative claims, the § 507(b)-annointed secured claim is *primus inter pares*.

The provisions of § 507(b) and those of related sections of the Code, examined in detail in Part II *infra*, have created "a complex maze of ambiguous statutory provisions and opaque, inconsistent case law." *Baybank–Middlesex v. Ralar Distributors, Inc.,* 69 F.3d 1200, 1204 (1st Cir.1995). I entirely agree with the First Circuit's forceful criticisms of § 507(b) and the courts' efforts to explicate the statutory scheme at whose center § 507(b) lies. In

---

**3.** If a Lift Stay/Adequate Protection Motion had been made by the Trustees, granted by the bankruptcy court, and the stay lifted or adequate security provided in response to that court's order, presumably the instant action would not have been filed. If the bankruptcy court had made an order for adequate protection and the mandated protection ultimately proved inadequate, it is common ground that the Bondholders' claims would have qualified for "superpriority" status under § 507(b) of the Bankruptcy Code, whose provisions lie at the heart of the case and are quoted and discussed in text. What the parties dispute, and this opinion addresses, is the legal consequence within the § 507(b) context of a bankruptcy court's denial of such a motion.

*Baybank–Middlesex* the First Circuit perceived a circumstance permitting it to "decline the invitation to enter the labyrinth ourselves, believing that we need go no further than its threshold." *Id.* I do not have that option. The Court of Appeals commands me to cross that threshold; and so, in what follows, I enter the labyrinth, hoping to avoid being devoured by the Minotaur of Error waiting at its center.[4]

## II.

### A.

 The Trustees contend that a bankruptcy court's denial of a motion for relief from stay or, in the alternative, for adequate protection on account of a pre-existing equity cushion does not entitle a secured creditor to a superpriority claim under § 507(b). They say that it is only when such a motion for adequate protection is granted and the additional protection conferred subsequently proves inadequate that a superpriority claim may become available.

The Bondholders contend that an order denying such a motion on the ground that the secured creditor was adequately protected by a pre-existing equity cushion triggers a superpriority administrative claim under § 507(b) if that equity cushion subsequently proves inadequate.

The parties agree that nowhere in the "opaque, inconsistent case law" generated by § 507(b) can one find a decision squarely in point. The elaborate briefs of counsel, and this Court's own research, have failed to unearth a holding by any court—Supreme, circuit, district or bankruptcy—that a bankruptcy court denial of a Trustees' Lift Stay/Adequate Protection Motion would bestow superpriority status upon the Bondholders' secured claims. Nor has any court held that the denial would not have that effect. The many cases cited by counsel state general principles or arise from arguably analogous circumstances. Counsel derive what comfort they can from such sources. But these cases are

4. The Bondholders argued in their brief to this Court, although not at oral argument, that Judge Mukasey had resolved the superpriority issue this opinion addresses in their favor, and they were entitled to invoke the law of the case doctrine. If I accepted that proposition it would have saved me considerable effort, but I do not accept it.

 In its opinion in this case, the Court of Appeals noted that the law of the case doctrine "is, at best, a discretionary doctrine, which does not constitute a limitation on the court's power but merely expresses a general reluctance, absent good cause, to reopen rulings that the parties have relied upon." 173 F.3d at 467 n. 12 (citation and internal quotation marks omitted). I think that if the judge whose prior ruling is cited as the law of the case subsequently expresses doubt that the ruling was sound, good cause exists for a successor judge to consider the matter *de novo.*

 That is the situation here. In an pretrial opinion dated August 27, 1997, 1997 WL 528283, Judge Mukasey indicated that the Trustees had the "better argument" in deriving from the text of § 507(b) the proposition that an already existing equity cushion is not something "provided" and therefore cannot serve as the predicate for superpriority status should it prove inadequate. In an order dated March 2, 1998, one week before trial, Judge Mukasey reversed course and said that "upon reflection" he believed that "if a court finds adequate protection to exist, whether as the result of a pre-existing equity cushion or otherwise, and denies a lift stay motion on that basis, if the protection later proves inadequate, the resulting claim may be awarded superpriority status." Order at 2. However, during the trial Judge Mukasey said at side bar: "I will also finally confess to you, in the privacy of this room, that there are very few subjects on which I have ever expressed a view in which I have as little confidence as I have in either of the expressions about super priority at this point." Trial Tr. at 950. And during the charge conference, Judge Mukasey specifically declined to instruct the jury with respect to the opinion he expressed in the March 2, 1998 order. This understandably disappointed counsel for the Bondholders, who argued to Judge Mukasey that "it is the law." The judge responded: "I don't know that it is." Trial Tr. at 1183.

 Meaning no disrespect to Chief Judge Mukasey (as he now is), I conclude in the exercise of my discretion that these shifting judicial sands provide an inadequate foundation for application of the law of the case doctrine. Accordingly I consider the question *de novo.*

really no more than straws blowing in the wind; and occasionally counsel disagree on the direction in which the same straw is blowing. The precise question presented—superpriority *vel non* in the particular circumstances of this case—is an open one in the courts. Nor is there any legislative history which squarely addresses the issue.

One thing is clear enough: both sides cannot be right. Either the Bondholders would have obtained superpriority in the assumed circumstances or they would not. The question identified by the Court of Appeals must either be answered "Yes," as the Bondholders say, or "No," as the Trustees say. In the absence of dispositive court precedent or legislative history, I must perforce derive the correct answer from the Bankruptcy Code's several provisions with respect to secured creditors.

### B.

The filing of a petition under the Bankruptcy Code shifts the tectonic plates under the feet of a debtor and its creditors. The economic terrain they inhabit will never be the same. That is because the Bankruptcy Code performs three separate but related functions. "In general, the essential applications of bankruptcy law can be classified into three basic categories: (i) debt collection, (ii) debt forgiveness, and (iii) debt adjustment, each responding to different aspects of the basic question of what is to be done with the property, person, and obligations of an insolvent debtor." Brunstad, *Bankruptcy and the Problems of Economic Futility: A Theory on the Unique Role of Bankruptcy Law*, 55 The Business Lawyer 499, 522 (American Bar Association, February 2000). The case at bar is concerned with the third application of the Code, "debt adjustment." The concept of debt adjustment "encompasses those aspects of any bankruptcy law that serve to alter the distributional rights of creditors as a group *inter se*." *Id.* at 525. The petition at bar was filed under Chapter 11 of the Code, which "accomplishes debt adjustment by suspending the enforcement rights of creditors, providing for the recovery of preferences, and by prescribing a method whereby the value of the debtor's property may be distributed in accordance with the terms of a negotiated plan that may or may not distribute value in accordance with the parties' nonbankruptcy priorities." *Id.* at 529 (footnotes omitted throughout).

Generally speaking, there are three categories of creditors: (i) unsecured, (ii) secured, and (iii) the holders of claims for administrative expenses incurred by the estate. The relationship between the debtor on the one hand and unsecured and secured creditors on the other comes into existence prepetition. Administrative claims as the result of goods or services rendered to the debtor arise postpetition.

The prepetition creditor who has relied solely on the debtor's credit is unsecured and takes last among all creditors in the distribution of the debtor's assets.

The secured creditor, not willing to rely on the debtor's credit alone, has bargained for and received a security interest in some portion of the debtor's property, which serves as collateral for the debtor's obligation. Prepetition, secured creditors usually have the power to take over the collateralized property if the debtor defaults. The foreclosed home, the repossessed car, are familiar and melancholy examples of the exercise of that power. In the case at bar, Eastern's fleet of aircraft served as collateral for the Trust whose Bonds the plaintiffs held.

But the filing of a bankruptcy petition, voluntary or involuntary, under any one of the several available chapters of the Code, automatically stays the secured creditor's power to foreclose upon the collateral. Thus the Code's automatic stay confers a considerable boon upon the debtor. The stay is also regarded as a source of "creditor protection," since without it creditors would race each other to achieve preferment through litigation, and "[b]ankruptcy is designed to provide an orderly proce-

dure under which all creditors are treated equally." Historical and Statutory Notes following 11 U.S.C. § 361 (1993) (hereinafter "Notes") at 3. However, the secured creditor has no interest in that grand design. Its specific purpose in bargaining for an interest in the debtor's property was to avoid being treated equally with "all creditors." What does the Code do for a secured creditor, frozen in place as was the Trust, unable to avail itself of the security for which it had bargained?

§ 506 of the Code defines the amount of a secured creditor's allowed secured claim. In relevant part it provides:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim ...

In *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 372, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), the Supreme Court held that the phrase "value of such creditor's interest" in § 506(a) means "the value of the collateral." The phrase means the same when applied to secured creditors in § 361(1) and (2), to which I will shortly come.

§ 507 of the Code, captioned "Priorities," deals comprehensively with the priorities of all claims against the bankrupt estate. § 507(b) is the subsection dealing specifically with secured claims. It provides:

If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.[5]

§ 507(b)'s reference to "a claim allowable under subsection (a)(1) of this section" is, by further cross-reference, an administrative expense allowed under section 503(b). *See* 11 U.S.C. § 507(a)(1). The relevant part of § 503(b) allows as administrative expenses "the actual, necessary costs and expenses of preserving the estate." *See* 11 U.S.C. § 503(b).

 § 507(b) reflects Congress's concern that, to the extent the section is applicable to a given case, a secured creditor have "adequate protection" for its claim. "The concept of adequate protection is derived from the fifth amendment protection of property interests as enunciated by the Supreme Court." Notes at 3 (citing *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940) and *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935)).

§ 507(b) also references §§ 362, 363 and 364 of the Code. The subsection is triggered if the debtor-in-possession "under

---

5. One clarifying note should be sounded. The "trustee" referred to in § 507(b)'s opening phrase is not the sort of Trustee that the defendants are. The statutory reference is to a trustee appointed by the bankruptcy court to preside over the insolvent debtor's estate. In the case at bar, Eastern filed a voluntary petition under Chapter 11, which permitted Eastern to continue as a debtor-in-possession. Since a debtor-in-possession "shall have all the rights ... and shall perform all the functions ... of a trustee serving in a case under this subchapter," 11 U.S.C. § 1107(a), the opening phrase in § 507(b) should be read for the purposes of this case as: "If the debtor-in-possession, under section 362, 363, or 364 of this title, provides adequate protection ... " That is the analysis employed by the Court of Appeals; *see* 173 at 466 n. 11.

section 362, 363, or 364 of this title" provides "adequate protection" to a secured creditor. As noted, § 362(a) stays creditors' proceedings against the debtor and its property. § 363(b)(1) authorizes a bankruptcy trustee to "use, sell, or lease, other than in the ordinary course of business, property of the estate." § 364(a) and (c) empower a trustee operating the business of the debtor to obtain unsecured or secured credit and incur unsecured or secured debt in the ordinary course of the business.

But each of these sections contains provisions under which secured creditors may invoke their interests. Thus § 362(d)(1) directs the bankruptcy court to grant relief from the stay to a party in interest "for cause, including the lack of adequate protection of an interest in property of such party in interest ..." § 363(e) provides that on application "of an entity that has an interest in property used, sold or leased, by the trustee," the bankruptcy court "shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." § 364(d)(1)(B) provides that the bankruptcy court may "authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if ... there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."

§ 361, captioned "Adequate protection," complements these specific protective provisions by delineating the manners in which "adequate protection may be provided" by the bankruptcy court in circumstances "[w]hen adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property." § 361(1) authorizes the court to require the bankruptcy trustee (or debtor-in-possession) to make a cash payment or periodic payments if application of these three sections "results in a decrease in the value of such entity's interest in such prop-

erty." § 361(2) authorizes the court to grant "to such entity an additional or replacement lien" to the extent that the "stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property."

§ 361(3), cast in broader terms, empowers the bankruptcy court to grant "such other relief ... as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." This language, added by the 1984 additions to the Bankruptcy Code, was intended "to indicate that the court may grant other forms of adequate protection, other than an administrative expense, which will result in the realization by the secured creditor of the indubitable equivalent of the creditor's interest in property." Notes following § 361 at 8.

Under the Supreme Court's holding in *Timbers*, throughout this statutory scheme the phrase "value of such creditor's interest" has the same meaning as "value of such entity's interest," and when either phrase is applied to secured creditors, it means "the value of the collateral." 484 U.S. at 372, 108 S.Ct. 626. The concept of adequate protection under § 361(3) entitles the secured creditor to the "realization" of "the indubitable equivalent" of its collateral, a result that will come to pass "not at once, but only upon completion of the reorganization. It is then that he must be assured 'realization ... of the indubitable equivalent of his collateral.'" *Id.*, 108 S.Ct. at 634.

To the extent that this statutory scheme of adequate protection for secured creditors applies to the circumstances of a given case, its purpose is summarized by the Historical and Statutory Notes following § 361 at 8–9:

Adequate protection of an interest of an entity in property is intended to protect a creditor's allowed secured claim. To the extent the protection proves to be inadequate after the fact, the creditor is entitled to a first priority administrative expense under section 503(b).

The careful reader will note in the last quoted sentence a veiled reference to § 507(b). That subsection, added by the 1984 Acts, is summarized by the Notes following § 507(b) at 844:

Subsection (b) provides that to the extent adequate protection of the interest of a holder of a claim proves to be inadequate, then the creditor's claim is given priority over every other allowable claim entitled to distribution under section 507(a).

## III.

The Trustees contend principally that the plain language of § 507(b) precludes conferring superpriority status upon the claim of a secured creditor if that creditor makes a Lift Stay/Adequate Protection Motion and the bankruptcy court denies it entirely, which is to say, the court refuses to lift the stay (so the collateral remains immune to suit and unavailable to the creditor), and also refuses to make an order of adequate protection, having concluded that the existing collateral adequately protects the creditor. § 507(b) is not triggered by such circumstances, the Trustees argue, even if the court was wrong, and protection the court viewed as adequate ultimately proves to be so inadequate that the secured creditor recovers nothing on its claim.

That proposition necessarily follows, the Trustees say, from § 507(b)'s introductory phrases: "If the [debtor-in-possession], under section 362, 363, or 364 of this title, provides adequate protection ..." The verb "provides," cast in the present tense, is consistent only with protection provided after filing of the Chapter 11 petition, a temporal concept reinforced by the requirement that the protection covered by § 507(b) must be provided by "the debtor-in-possession," a status which a debtor attains only after a petition is filed. Thus, in

the case at bar, Eastern became a debtor of the Trust and, derivatively, the Bondholders in 1986, upon completion of the financing arrangement which created the equity cushion. Eastern did not become a "debtor-in-possession" until 1989, when it filed its voluntary Chapter 11 petition.

Moreover, § 507(b) specifies that the debtor-in-possession provide adequate protection "under section 362, 363, or 364" of the Bankruptcy Code. "Under," in this context, may be read as synonymous with "pursuant to"; and the various mechanisms available to secured creditors for obtaining adequate protection pursuant to [or under] §§ 362, 363 and 364, further implemented by the remedies of § 361, can only come into effect upon the filing of a bankruptcy petition.

The Bondholders respond that this literal reading of § 507(b) thwarts the Code's relevant purpose, which is to protect secured creditors. They cite, among other cases, *Holy Trinity Church v. United States*, 143 U.S. 457, 460, 12 S.Ct. 511, 36 L.Ed. 226 (1892) ("If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity. The court must restrain the words. The object designed to be reached by the act must limit and control the literal import of the terms and phrases employed.") (citation omitted). In the case at bar, the Bondholders argue that with respect to a secured creditor's ultimate loss, there is no principled difference between a bankruptcy court's ordering additional protection which later proves to be inadequate, and the court's denying that relief based upon the equally erroneous conclusion that the pre-existing protection is adequate. In both instances, the bankruptcy's court's error and the adverse consequences to the secured creditor are precisely the same.[6]

---

**6.** The parties' differences arise out the first prerequisite to § 507(b) superpriority status, found in the subsection's introductory phrases. There are other prerequisites. § 507(b) requires that a secured creditor's claim be

"allowable under subsection (a)(1) of this section" and "arising from" conduct covered by §§ 362, 363, or 364(d). The Bondholders' claims satisfy these conditions. § 507(a)(1) cross-references § 503(b), which provides

Each party makes the point that if Congress intended § 507(b) to mean what the other party says it means, Congress would have used language saying so explicitly. Both parties correctly argue that Congress could have expressed itself more clearly, but the arguments cancel each other out, and I am left to deal with the Delphic aspects of the words Congress actually used.

I think that both parties advance reasonable interpretations of an ambiguous statute. One aspect of the case is clear enough: both parties cannot be right. Therefore I must choose between irreconcilable statutory constructions, each having a surface plausibility.

■ In *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), the Supreme Court gave some general guidance for the resolution of such questions. *Timbers* involved the proper interpretation of § 362(d)(1) of the Bankruptcy Code in a case where both parties offered contradictory but reasonable meanings. Justice Scalia wrote for a unanimous Court:

> Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.

484 U.S. at 371, 108 S.Ct. 626 (citations omitted).

Applying those interpretive aids to the case at bar, I conclude that the Trustees' interpretation of § 507(b) is the better one.

While the Bondholders' reading of the subsection is permissible, it requires considerable stretching of the language. The Trust's equity cushion came into being as part of the original financing transaction, when everyone's hopes were high and Eastern's horizon free of the gathering clouds of bankruptcy. It is a stretch to read § 507(b)'s reference to a "debtor-in-possession" as including an entity that became a "debtor" by means of the underlying transaction, at a time when becoming a "debtor-in-possession" was the last thing anyone wanted.

It is equally a stretch to read § 507(b)'s use of the *present tense* verb "provides" as including a bankruptcy court's order denying an adequate protection motion on the ground that *in the past,* that is to say prepetition, a debtor had provided collateral ostensibly sufficient to secure the claim of the moving creditor.

Of course, the court's order occurs postpetition, but that does not carry the Bondholders far enough. They must argue that for purposes of qualifying for superpriority status under § 507(b), a court's order *denying* adequate protection is the functional equivalent of a debtor-in-possession's *providing* that protection in response to a court order granting it. The semantic obstacles to that interpretation are apparent.

Accordingly there is considerable force to the Trustees' "plain meaning" argument, which if accepted would dispose of the issue, even if one sympathized with the Bondholders' plight, condemned the

that administrative expenses include the "actual, necessary costs and expenses of preserving the estate." The use of collateral to keep a business operating qualifies as an administrative expense. *See In re J.F.K. Acquisitions Group,* 166 B.R. 207, 212 (Bankr.E.D.N.Y. 1994) ("Since the Debtor's use of the Hotel and its proceeds went to maintain the property and operate the business, it was an essential aspect of its efforts to reorganize. The use of the collateral was an actual and neces-

sary cost of preserving the estate. Therefore, the claim of Americana is allowable as an administrative claim under Section 503(b)"). One cannot imagine a more "essential aspect" of an airline's efforts to reorganize than the use of its aircraft. Moreover, the Bondholders' claims arise from the automatic stay imposed by § 362(a)(1), which prevented the Trustee from foreclosing on the collateralized aircraft.

Trustees' sloth, and discerned no principled difference for superpriority purposes between orders granting and denying adequate protection. *See In re Flagstaff Foodservice Corp.*, 739 F.2d 73, 75 (2d Cir.1984) ("Where, as here, the statutory language clearly expresses the congressional intent, a court may not read another meaning into the statute in order to arrive at a result which the court deems preferable") (construing §§ 330, 331, 364(c)(1), 503(b) and 507(b) of the Code, and concluding that secured creditor's interest had priority over attorneys' claim for postpetition services).

Nevertheless, § 507(b) is less than precise, and as I have said, I think that the Bondholders' interpretation is permissible. But the subsection's language inclines sufficiently in favor of the Trustees to cast upon the Bondholders the burden of demonstrating that, given the objectives of the Bankruptcy Code, the Trustees' interpretation of § 507(b) leads to an absurd result. The Bondholders do not make that showing.

█ While the Bondholders rely upon general legislative statements that § 507(b) is intended for the protection of secured creditors, some of which I have quoted *supra*, such statements cannot trump plain indications of congressional purpose derived from the statute. *See Timbers*, 484 U.S. at 380, 108 S.Ct. 626 (while the legislative history includes statements that "secured creditors should not be deprived of the benefit of their bargain," . . . "[s]uch generalizations are inadequate to overcome the plain textual indication in §§ 506 and 362(d)(2) of the Code that Congress did not wish the undersecured creditor to receive interest on his collateral during the term of the stay."). Nor can the Code be regarded as expressing the intent of Congress that secured creditors receive total, 100% ironclad protection; *see Timbers* at 379–80, 108 S.Ct. 626 ("That secured creditors do not bear one kind of reorganization cost

hardly means that they bear none of them.").

I think it plain that the Bankruptcy Code has a number of particular objectives, which is hardly surprising for a statutory scheme that, in Brunstad's phrase, undertakes to answer "the basic question of what is to be done with the property, person, and obligations of an insolvent debtor." The desires and purposes of debtors and creditors are inherently in conflict, as are the desires and purposes of creditors *inter se* (secured versus unsecured). The Bankruptcy Code necessarily embodies compromises between competing economic interests.

█ In the context of a Chapter 11 reorganization, a primary objective of the Code is the rehabilitation of the debtor. Congress's purpose in enacting Chapter 11 was "to establish a preference for reorganizations, where they are legally feasible and economically practical." *In re Baker & Drake, Inc.*, 35 F.3d 1348, 1354 (9th Cir.1994). "The object of Chapter 11 of the Code is to permit a potentially viable debtor to restructure and emerge from bankruptcy protection." *In re Kings Terrace Nursing Home and Health Related Facility*, 184 B.R. 200, 203 (S.D.N.Y.1995). For obvious reasons, Congress prefers the successful reorganization of a corporate debtor to liquidation, dismemberment and death under Chapter 7.

Since a reorganization must be "economically practical" to succeed, it is at once apparent that a superpriority claim is the natural enemy of a reorganization. The superpriority claim is preferred even among administrative expenses, and must accordingly be a matter of concern to those whose postpetition dealings with a debtor-in-possession may be essential to the debtor's economic survival. *See In re Flagstaff Foodservice Corp.*, 739 F.2d at 75 ("Under the law as it presently exists, knowledgeable bankruptcy attorneys must be aware that the priority ordinarily given to administrative expenses may prove illusive in light of the various provisions in the

code for competing or super-priorities.") (citation and internal quotation marks omitted). Thus the overhanging, intimidating presence of a multi-million dollar superpriority claim may chill the willingness of others to do business with a debtor-in-possession, dooming that resolution preferred by Congress, a successful reorganization, and leading to liquidation.

These practical concerns resound in the case at bar because the Bondholders argue for the broadest conceivable superpriority for an oversecured creditor sitting on an equity cushion when a bankruptcy petition is filed. The Bondholders say that all a secured creditor need do to achieve superpriority status is to make a Lift Stay/Adequate Protection Motion. Superpriority is then guaranteed, whether the bankruptcy court grants relief or denies it. Opening to the jury at the first trial, counsel for the Bondholders likened their situation to that of the assureds under an insurance policy:

> Super priority is like an insurance policy. It's designed so that if the unexpected happens, you get protected. But, just like an insurance policy, you have got to pay a premium. You have got to do something. You have got to sign up for it.

> Well, the way you sign up for a super priority claim is very simple. It doesn't cost you money. All it requires is you raise your hand and ask. You go into bankruptcy court and you make a motion. You say to the judge, I'm not protected, please protect me. And once you start that process rolling, the please-protect-me process, if things go wrong, you get the super priority. . . .

> And even if he denies your adequate protection motion, you get your priority claim if it turns out you are not going to get paid in full, because implicit in that denial is a determination by the judge that, I'm denying it because you are adequately protected. If he wasn't making that implicit determination, he has got to grant your motion.

Trial Tr. 139–141.

The analogy to an insurance policy is not entirely apt, since if the equity cushion disappears and the security proves to be inadequate, the superpriority-brandishing secured creditor is paid not by an insurance company but by the debtor, to the derogation of other creditors and, quite possibly, to the debtor's hope for rehabilitation.

I do not doubt that Congress could enact a statute so favorable to oversecured creditors, but I do not think that it has done so in the present Code. I think that the Code protects secured creditors up to a point, but not beyond, and the point of demarcation is reached when granting superpriority status would imperil other identifiable objectives of the Code, which include a preference for economically feasible reorganizations.

The limited nature of the benefit conferred upon secured creditors by § 507(b) is inherent in its reference to a debtor-in-possession who "under section 362, 363, or 364 of this title, provides adequate protection." That language conjures up the image of a debtor providing additional protection to a secured creditor in obedience to the bankruptcy court's order granting a motion brought by the creditor under one of the three designated sections. It is one thing to say that if this court-ordered, debtor-provided protection proves to be inadequate, then under § 507(b) the secured creditor "has superpriority for a claim in the amount that the debtor's use of the collateral during the time of the stay diminished the value of the collateral, but only to the extent such diminution is in excess of the adequate protection received." *In re Blackwood Associates, L.P.*, 153 F.3d 61, 69 (2d Cir.1998). It is quite another to say that the court's denial of any adequate protection entitles the creditor to a superpriority claim for the

full diminution in the value of the collateral.[7]

I do not think that the statutory scheme tips so far in favor of secured creditors. Although no court has explicitly said so, that is the view of a leading commentator. *See* 4 Lawrence P. King, *et al.*, *Collier on Bankruptcy* ¶ 507.12(1)(c)(ii) (15th ed. rev. 1999) at 507–90–91:

> If the property in question declines in value between the time that adequate protection is provided and the time that the property is returned to the creditor, the creditor will be entitled to a section 507(b) priority for the amount of the decline. It should be kept in mind, however, that the creditor is not automatically entitled to a priority for the decline in value but is so entitled only where the creditor has specifically been provided with adequate protection. If a court declines to grant relief from stay because the court determines that no cause exists or that the creditor is adequately protected by the value of the collateral or by other factors, the creditor has not been granted adequate protection. If the court believes that the value of the property is not likely to decrease in value and declines to terminate the automatic stay on that basis, there is no grant of adequate protection and a creditor should not be entitled to assert a section 507(b) claim merely because the court's belief proves to be incorrect and the property actually does decline in value.

(footnote omitted).

I reach that conclusion in the case at bar. I do so because (a) the Trustees' interpretation of § 507(b) conforms more closely to the language of that subsection and its interconnection with other provisions of the Bankruptcy Code, and (b) the Bondholders have failed to demonstrate that the Code's statutory scheme and objectives render the Trustees' interpretation an absurdity.

The Bondholders argue with considerable force that it is anomalous for the granting and denial of an adequate protection motion to have such disparate consequences, when the bankruptcy court's error in assessing adequacy and the consequent prejudice to the secured creditor are the same. However, in view of the language Congress used and the manner in which the Code's sections cross-reference each other, that is an anomaly that the Congress must remedy.

For the foregoing reasons, the Court answers the question presented in the negative, and will so instruct the jury.[8]

It is SO ORDERED.

---

**7.** The Bondholders cite a number of cases for the proposition that "[a]n equity cushion falls within the range of ways by which adequate protection may be provided," Bondholders' Brief at 14. *See, e.g.*, *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir.1984) ("Although the existence of an equity cushion as a method of adequate protection is not specifically mentioned in § 361, it is the classic form of protection for a secured debt justifying the restraint of lien enforcement by a bankruptcy court."). Applying that concept, the Ninth Circuit reversed the bankruptcy court's lifting of the stay on the ground of inadequate protection. But cases like *Mellor*, which reach the unremarkable conclusion that adequate protection may take the form of an equity

cushion, shed no light upon the quite different question of superpriority status under § 507(b), the issue posed by the case at bar.

**8.** Counsel for the Trustees profess to find in the Supreme Court's decision in *Timbers*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740, a rationale that requires acceptance of their interpretation of § 507(b)'s superpriority provisions.

The Court granted certiorari in *Timbers* "to determine whether undersecured creditors are entitled to compensation under 11 U.S.C. § 362(d)(1) for the delay caused by the automatic stay in foreclosing on their collateral," 484 U.S. at 369, 108 S.Ct. 626, and held that "the undersecured petitioner is not entitled to

interest on its collateral during the stay to assure adequate protection under 11 U.S.C. § 363(d)(1)." *Id.* at 382, 108 S.Ct. 626. At first blush, indeed at second blush, the case would seem to have little to do with the issue at bar, which considers the superpriority status under § 507(b) of an oversecured creditor with a pre-existing equity cushion, particularly since *Timbers* neither discusses superpriorities nor cites § 507(b).

Counsel for the Trustees derive from *Timbers* a holding that "the interest of the creditor that is protected under the Bankruptcy Code is the allowed secured claim," from which they say it follows that an equity cushion is not entitled to adequate protection, from which it further follows that the Trustees are reading § 507(b) correctly. Oral Argument Tr. at 55. The deficiency may be entirely mine, but I am unable to perceive how *Timbers* governs this case. I resolve the issue for the reasons stated in text.