**In re WILSON–SEAFRESH, INC. a/k/a D.W. Wilson Seafood, Inc. a/k/a Sea Fresh Seafood, Inc., Debtor.**

**No. 99–70289–TLH4.**

United States Bankruptcy Court, N.D. Florida, Tallahassee Division.

June 18, 2001.

Anne Sumblin, David Anderson, Walston, Wells, Anderson & Bains, L.L.P., Kinston, AL, Charles Gardner, Tallahassee, FL, for CB & T.

C. Edwin Rude, Jr., Tallahassee, FL, for Debtor.

John E. Venn, Jr., Pensacola, FL, for Trustee.

## MEMORANDUM OF OPINION

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS MATTER was heard on April 19, 2001, on the motion of Community Bank & Trust of Southeast Alabama (CB & T) for the allowance of a superpriority claim, for disgorgement of fees and expenses previously paid to professionals, and to require the debtor to disburse unencumbered funds to superpriority administrative claimants. For the reasons set forth herein, CB & T's motion shall be granted. This Memorandum of Opinion constitutes findings of fact and conclusions of law pursuant to Fed. R Bankr.P. 7052.

The pertinent facts relating to the instant motion are not seriously in dispute. The debtor, Wilson/Sea Fresh, commenced a case under Chapter 11 of the Bankruptcy Code by filing its petition on April 28, 1999. Subsequent thereto, the debtor-in-possession sought and obtained authority to employ as its attorneys, C. Edwin Rude, Jr. and the law firm of Pennington, Moore, Wilkinson, et al., and Patrick J. Floyd.

The debtor-in-possession also applied and received authority to employ William D. Crona of the firm Law, Redd, Crona, & Monroe as its accountants (collectively, the "debtor's professionals"). Following the May 19th appointment of the unsecured creditor's committee, an application was filed for approval of the employment of Louis Long as attorney for the committee. That application was approved by an order entered on June 8th.

At the time the case was filed, CB & T was owed in excess of $2.7 million, secured by a properly perfected security interest in the debtor's accounts receivable. Immediately upon commencement of the case, the debtor sought authority for use of cash collateral. CB & T objected to such use. On May 5, 1999, the debtor filed its motion for interim/final order authorizing the use of cash collateral and request for emergency hearing, and CB & T filed its motion to prohibit use of cash collateral and a motion for relief from stay.

An emergency telephonic hearing was held on May 6th to consider an interim order authorizing use of cash collateral pending a final hearing. At that hearing, it was established without dispute that as of the date of the petition initiating this case, the accounts receivable securing CB & T's loan had a fair market value of $836,615.60. As a result of that hearing, the court entered an interim order approving a limited use of cash collateral, granting adequate protection to CB & T in the form of replacement liens on post-petition assets of the debtor, and further requiring weekly periodic accountings setting forth cash receipts and disbursements made by the debtor in accordance with the interim cash collateral order. The final hearing on the cash collateral motions was scheduled for May 20, 1999. Subsequently, the final hearing was rescheduled to June 2, 1999, to coincide with the final hearing on CB & T's motion for relief from stay.

At the final hearing, the debtor presented extensive testimony and evidence reflecting its position that the company was able to operate profitably going forward. The centerpiece of the debtor's case was that it had recently hired Doug Patterson as a new comptroller for the corporation. The debtor testified that Patterson had instituted accounting systems which would enable the debtor to provide accurate and up to date financial reports, and would enable the debtor to evaluate the profitability of its various products in order to maximize the company's net income. The evidence further established that the debtor's combined accounts receivable and inventory far exceeded the $836,615 value of CB & T's lien as of the petition date. Based on the debtor's assurances that its operations would be profitable, and that Patterson would insure timely and accurate reports of operations, accounts, and inventory, a final order was entered dated September 7, 1999, authorizing the continued use of cash collateral by the debtor-in-possession. Community Bank & Trust was granted adequate protection in the form of a replacement lien on post-petition accounts receivable and inventory of the debtor up to a total of $836,615. The adequate protection order required weekly reports setting forth cash receipts, cash disbursements, expenses incurred by the debtor, and inventory sold and purchased by the debtor during the reporting period. The authority to use cash collateral allowed such use in accordance with a previously approved interim budget submitted by the debtor. This budget did not include the payment of professional fees.

From the conclusion of the cash collateral hearing until the end of April, 2000, the debtor operated under the cash collateral order, filing its reports as required.

These weekly reports, filed through the week ending April 21, 2000, consistently reflected combined inventory and accounts receivable in excess of $1.3 million. The final report, filed on April 28, 2000, covering the week of April 15–21, reflected combined accounts receivable and inventory of $1,352,228. What was not revealed in the reports or to the creditors in this case was that Doug Patterson was no longer preparing them.

In mid December, 1999, Patterson left his full time position as comptroller of Wilson Sea/Fresh. Prior to his departure, he turned over the reporting duties to Genise Brown, the previous bookkeeper for the debtor. While she was trained by Patterson to compile the reports, there were problems with the reports once she began preparing them. Beginning with the November Rule 2015 debtor in possession report, the monthly reports were filed consistently late. The November and December reports were not filed until February 8, 2000. The January report was filed on March 20, and the February report was filed on April 4. The March and April reports were filed on June 7. A reconciliation of the books performed by Patterson in conjunction with the preparation of the March and April reports revealed significant errors in the November, January and February reports. While Doug Patterson was no longer employed full time with the debtor after December, 1999, he continued to work on a part time basis, normally one day per week, until April 28, 2000.

During the time between April, 1999, and April, 2000, the debtor's professionals and the attorney for the Unsecured Creditor's Committee applied twice for the allowance and payment of interim fees. Both times, CB & T filed, but did not vigorously pursue, objections to the payment of interim fees from its cash collateral to the extent that such cash collateral

was not adequately protected. With the express recognition that all objections by CB & T were preserved and that any interim fee awards were subject to further review, orders were entered allowing interim fees to the professionals and authorizing payment thereof. Pursuant to those orders, the various professionals were paid the following sums:

| | |
|---|---|
| Pennington, Moore, et. al. | $129,315.46 |
| Patrick Floyd | $ 33,913.18 |
| Law, Redd & Crona | $ 38,625.31 |
| Louis Long | $ 15,984.06 |

Sometime in late April, 1999, the wheels came off of the debtor's reorganization attempt. Kirk Brown, the attorney for Citizen's Bank, (another creditor in this case) notified CB & T that a bank employee had been at the debtor's plant and had observed that the visible inventory appeared to be much less than had been reported. CB & T officials went to the plant. They found that the debtor had different sets of books, that the debtor was reporting inventory that it did not have, and that the accounts receivable were much less than had been reported. $125,000 of the accounts receivable actually on the books were over 90 days old. CB & T filed an Emergency Motion to Prohibit the Use of Cash Collateral and to Terminate Exclusivity on May 3, 2000.

An emergency hearing was convened on May 9, 2000. The debtor conceded that it could no longer operate. By order entered on May 19th and consented to by the debtor, the debtor's exclusive period for filing a plan was terminated, and its use of cash collateral was prohibited except as consented to by CB & T. By separate order, the automatic stay was modified so as to permit CB & T to collect the proceeds from the debtor's accounts and inventory. CB & T and the debtor agreed that the debtor would liquidate the inventory and could utilize cash collateral to pay the expenses essential to the preservation

and liquidation of the accounts and inventory.

Following the entry of the orders lifting the stay and prohibiting the use of cash collateral, CB & T commenced the collection of the accounts receivable. The debtor provided no assistance to CB & T in the collection of the accounts except for verifying the status of various accounts when problems arose. Problems did indeed arise. The debtor delivered to CB & T a receivables list and invoices for collection totaling $782,485.08. Out of that sum, CB & T was only able to collect a total of $284,221.82 between May 17, 2000 and October 18, 2000. Of the remaining balance of the listed receivables, $241,856.85 was uncollectible as either disputed or very old. An additional $240,204.97 had already been collected by the debtor and not remitted to CB & T. When contacted by CB & T regarding the disputed accounts, the debtor in almost all instances verified the version of facts given by the account debtors relating to the disputes.

The liquidation of the remaining inventory by the debtor produced even more dismal results. After payment of the expenses of storage and liquidation, the debtor's sale of it's remaining inventory produced only $19,011.29 for application against the CB & T loan.

In recognition of the looming shortfall in CB & T's adequate protection, the debtor, with the consent of the Unsecured Creditor's Committee and the United States Trustee, agreed to remit to CB & T the proceeds from the liquidation of unencumbered assets. This produced another $95,901.25. An additional $9,714.83 was received from collections after October 18, 2000. The total of the collections for application against CB & T's secured claim was $408,849.19. Thus, there is a shortfall in CB & T's adequate protection of $427,765.81.

All of its collateral having been liquidated, CB & T filed the instant motion seeking the allowance of a superpriority administrative expense for the deficiency in its adequate protection, for a disgorgement of all fees and expenses paid to professionals on an interim basis, and the distribution of unencumbered funds to the superpriority claimants. The debtor and the debtor's professionals responded to the motion asserting that it was premature since there had not yet been a showing that the estate was administratively insolvent, that disgorgement of professional fees is within the discretion of the court and, that since the professionals had done nothing wrong, it would be inequitable and confiscatory to order the disgorgement of their fees and expenses.

At the hearing on the motion, CB & T presented evidence to establish the circumstances and amount of the shortfall in the adequate protection of its cash collateral. Thereafter, the debtor's professionals presented evidence to support their position. The major thrust of the professionals' evidence was that the estate still had valuable assets which could be sold and therefore it was premature to make a finding that disgorgement was fees was necessary in order to compensate CB & T for its superpriority claim. The most significant asset to which the debtor and its professionals point are three oyster leases consisting of 98 acres located in the Apalachicola Bay. These three leases were quit claimed to the debtor by its principal, Donnie Wilson, the day prior to the filing of the petition initiating this case. The leases in question are referred to as "Chapter 370" leases, which continue in perpetuity. These are unique because under Florida Statute § 597.010(12), Chapter 370. Perpetual Leases shall no longer be available in Franklin County. However, the debtor and his professionals were unable to pres-

ent any admissible evidence to establish a market value of the oyster leases. The only thing they presented in an effort to establish a value was Florida Statute § 376.121(5)(b)(4) which provides a formula for compensation for damage to the natural resources of the state as a result of a pollutant discharge. This section provides for compensation in the amount of fifty cents per square foot of live bottom, oyster reefs, worm rock, perennial algae, salt marsh, or fresh water title marsh. F.S.A. § 376.121(5)(a)(4)(d). There has been no showing that this statutory formula bears any relationship to the market value of these oyster bars. It's inconceivable that oyster bars and perennial algae could have the same fair market value. Additionally, the oyster leases in question are subject to a lien in favor of LPP Mortgage Ltd. as successor to the Small Business Administration in the amount of $511,212.06 as of December 18, 2000. Finally, in May of 2000. Donnie Wilson, the debtor's principal, without the knowledge of any creditors of the estate or the debtor's professionals, and without authority of the court, subleased two of the three leases to a third party. Thus, there is no evidence to support the debtors or a professional's assertion that liquidation of these oyster leases would bring any significant sums of money into the estate.

In their trial brief, the debtor's professionals identified, in addition to the oyster leases, a number of alleged valuable assets including $160,000 of missing frozen oyster inventory, possible unauthorized post-petition transfers to Buddy Ward Seafood in the amount of $45,000, missing containers stored in Eastpoint, Florida worth $25,000, missing inventory worth $209,773, scallop buckets worth $18,000, a pending patent application and other potential causes of action. However, no credible evidence was submitted to substantiate the existence and viability of these assets. Further-

more, neither the debtor nor its professionals have initiated any action whatsoever to collect such alleged assets since this case went into liquidation mode. The debtor's professionals also argued that CB & T's settlements in September, 1999, with two of the debtor's principals, Donnie Wilson and Jerry Paulk on their individual guarantees on the loans, should be credited against any superpriority claim. This assertion is without any support neither in fact or in law.

The evidence presented by the accountants established that their services during the case consisted primarily of tax accounting that provided a significant benefit to the estate. However, they were not at all involved in the operational aspects of the debtor. On completion of the corporate tax return for the debtor for the year ended 12/31/98, the accountants calculated a net operating loss for previous years in the amount of $6,619,000.00 which enabled the debtor to recover tax over-payments for the years 1996 and 1997. The remaining net operating loss may be a valuable asset which could be transferred through the sale of the stock of the corporation. Nevertheless, there are significant limitations on the value of that asset, and its value to this debtor is highly speculative.

The legal issues to be decided in considering the instant motion are:

1. Is CB & T entitled to a superpriority administrative expense;

2. If CB & T is entitled to a superpriority administrative expense, may the professionals be ordered to disgorge fees and costs paid on an interim basis during the case to apply to such superpriority administrative claim and;

3. Does the court have discretion to order such disgorgement or not depending on the equities of the case.

The claim of CB & T to a superpriority administrative expense is based on the provisions of 11 U.S.C. § 507(b). Section 507(b) states:

> If the trustee under § 362, 363, or 364 of this Title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under § 362 of this title, from the use, sale, or lease of such property under § 363 of this title, or from the granting of a lien under § 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection. 11 U.S.C. § 507(b).

"This section provides that when adequate protection has been given to a secured creditor and later proves to be inadequate, the creditor becomes entitled to a superpriority administrative expense claim to the extent that the preferred adequate protection was insufficient." *Bonapfel v. Nalley Motor Trucks (In re Carpet Ctr. Leasing Co.)*, 991 F.2d 682, 685 (11th Cir.1993). Here, it is clear that the provisions of § 507(b) have been met. CB & T was provided adequate protection for its $836,615.60 in collateral at the time the case was filed. It was prevented by the automatic stay of § 362 from realizing on that value, and the debtor was permitted under § 363 to use the proceeds of that collateral in its operations. There is no doubt that without the ability to use CB & T's cash collateral, the debtor would not have been able to operate at all postpetition. Due to the debtor's use of the cash, and its failure to maintain a sufficient level of property subject to a replacement lien in favor of CB & T, the adequate protection proved to be insufficient in the amount of $427,765.81. *In re Mendez,* 259 B.R. 754 (Bankr.M.D.Fla.2001).

Since it is clear that CB & T is entitled to a superpriority claim under § 507(b), the more difficult question is whether or not the interim fees paid to professionals must be ordered disgorged in order to pay the superpriority claim, as there are clearly insufficient assets remaining in the estate to pay that claim. While the Bankruptcy Code itself makes no mention of disgorgement of fees, case law clearly recognizes the authority of the bankruptcy court to order the disgorgement of fees under various situations.

Failure to make adequate disclosure of conflicts can result in the forfeiture of fees actually earned. *In re Woodward,* 229 B.R. 468 (Bankr.N.D.Okla.1999) (failure of debtor's attorney to properly disclose compensation was, in and of itself, grounds for disgorgement without regard to reasonableness of fees or whether attorney may have earned fee by performing valuable services); *In re Keller Financial Services of Florida, Inc.,* 248 B.R. 859 (Bankr.M.D.Fla.2000). Interim fees can also be disgorged on the merits when final approval is sought. *In re Taxman Clothing Co.,* 49 F.3d 310 (7th Cir.1995).

Interim fees can also be disgorged when a case becomes administratively insolvent, thereby requiring a redistribution of the fees paid, so that those unpaid creditors of the same class share on a pro rata basis. *In re Unitcast, Inc.,* 219 B.R. 741 (6th Cir. BAP 1997); *In re Chute,* 235 B.R. 700 (Bankr.D.Mass.1999); *In re Anolik,* 207 B.R. 34 (Bankr.D.Mass.1997). In this situation, there is a recognized split in the authority as to whether or not a bankruptcy court may exercise its discretion in deciding whether or not to order the disgorgement of fees in order to achieve a pro rata distribution to unpaid creditors of the

same class. *Unitcast* at 752–754. ("We agree with the bankruptcy court that § 726(b) does not compel disgorgement from professionals in every administrative insolvency.") and *In re Kingston Turf Farms, Inc.*, 176 B.R. 308, 310 (Bankr. D.R.I.1995) ("[D]isgorgement is required as a matter of law, just to adhere to the mandatory payment scheme of the Code ...."). However, this line of cases does not apply to the instant case.

■ Interim fee awards have been ordered disgorged in order to satisfy superpriority claims under § 507(b), similarly to the claim of CB & T in this case. *In re Kids Creek Partners, LP*, 236 B.R. 871 (Bankr.N.D.Ill.1999); *In re Printcrafters, Inc.*, 208 B.R. 968 (Bankr.D.Colo.1997); *In re Matz v. Hoseman*, 197 B.R. 635 (N.D.Ill.1996); *U.S. Trustee v. Johnston*, 189 B.R. 676 (N.D.Miss.1995); *In re Wise Transportation*, 148 B.R. 52 (Bankr. N.D.Okla.1992). It is this category of disgorgement cases that apply here, requiring the disgorgement of funds paid to professionals on an interim basis during the Chapter 11 administration.

■ The debtor's professionals' pled that by ordering disgorgement

> CB & T in effect would have this court—after the fact—treat the debtor's attorneys and accountants as having pledged the entire value of their professional services to the debtor ... to guarantee that the value of the debtor's inventories and receivables would not decline while the debtor continued his business operations ....

The professionals further assert that such disgorgement would constitute a confiscation from them. However, there are both statutory and constitutional grounds for ordering the disgorgement. Statutorily, for the court to fail to order the disgorgement would be to ignore the mandatory distributive provisions of the Bankruptcy Code. As stated by the *Printcrafters, Inc.* court, *supra.* "Bankruptcy courts are not free to rearrange Congress' priorities for the treatment of creditors based on equitable grounds, except by application of § 510 to the claim of a particular creditor." 208 B.R. at 973. That court further stated "the risk of disgorgement is shared by all professionals serving a Chapter 11 debtor-in-possession". *Id.* at 972. As a constitutional matter, "[s]ection 507(b) reflects Congress' concern that, to the extent this section is applicable to a given case, a secured creditor have 'adequate protection' for its claim. The concept of adequate protection is derived from the Fifth Amendment protection of property interest as annunciated by the Supreme Court." *LNC Investments, Inc. v. First Fidelity Bank*, 247 B.R. 38, 44 (S.D.N.Y. 2000). CB & T's superpriority claim is based on the protection of a Fifth Amendment property right. The professionals' claim is merely an administrative expense provided for under the Bankruptcy Code. The constitutional interest must prevail. It goes without saying, that "the law is clear, all interim awards of attorneys' fees in bankruptcy cases are tentative". *In re Taxman Clothing Co.*, 49 F.3d at 312.

The primary case relied upon by the debtor's professionals in support of their position is *In re Unitcast, Inc., supra.* However, that case does not apply to the instant situation. In the *Unitcast* case, the government was seeking both the allowance of an administrative expense and disgorgement of professional fees in order to achieve a pro rata distribution among administrative expense creditors. The court in that case held that based on the facts presented, the United States did not have an administrative expense claim, and that the Bankruptcy Code does not compel disgorgement from professionals in every case in every case of administrative insol-

vency. Rather, disgorgement is a remedy within the discretion of the bankruptcy court. The instant case, however, does not deal with disgorgement in order to achieve a pro rata distribution amongst administrative claims of the same class. Here, CB & T's superpriority claim occupies a higher status than that of the professionals in the bankruptcy case, and is entitled to paid in full before the professionals receive anything.

■■ The forced disgorgement of fees already paid is admittedly a harsh remedy. However, those who voluntarily undertake the representation of parties in a reorganization and expect their fees to be paid, if at all, from the estate, assume the risk of non-payment or even disgorgement of interim fees, if the case fails. The priority scheme set forth in the Bankruptcy Code must be applied regardless of the fault of the professionals or the equities of the situation. Thus, even the fees and expenses of the attorney for the unsecured creditor's committee awarded and paid from the estate must be disgorged just as those of the debtor's professionals. The superpriority claim of CB & T must be paid before the professionals receive anything from the estate. The only way to achieve this is the disgorgement of all payments made the professionals on an interim basis during the administration of this case.

A separate order will be entered in accordance herewith.